1   Joseph E. Herman (SBN 58899)
    Law Offices of Joseph E. Herman
    114 S. Rossmore Avenue
2   Los Angeles, CA 90004
    Telephone:  (323) 937-1400
3   Facsimile:   (323) 931-7369

4   Joseph C. Markowitz (SBN 146592)
    Law Offices of Joseph C. Markowitz
5   444 S. Flower Street, Suite 1750
    Los Angeles, CA 90071
6   Telephone:  (213) 437-1720
    Facsimile:   (213) 437-1721
7   jcmarkowitz@gmail.com

8   Attorneys for Defendant,
    GIUMARRA VINEYARDS CORPORATION
9

10                 **UNITED STATES DISTRICT COURT**

11           **FOR THE EASTERN DISTRICT OF CALIFORNIA**

12                         **FRESNO DIVISION**

13

14  RAFAEL MUNOZ, SANTOS R.              )   Case No. 1:09-cv-00703-AWI-JLT
    VALENZUELA, TRINIDAD RUIZ,           )   *Hon. Jennifer L. Thurston*
15  MARTA R. RINCON de DIAZ, RAMON       )
    CERVANTES PERALES and HUGO           )
16  PEREZ RIOS on behalf of themselves, and  )   **DEFENDANT GIUMARRA**
    all current and former employees, and on )   **VINEYARDS CORPORATION'S**
17  behalf of a class of similarly situated  )   **OPPOSITION TO PLAINTIFFS'**
    employees,                           )   **MOTION FOR CLASS**
18                                       )   **CERTIFICATION**
                  Plaintiffs,            )
19                                       )
                                         )   Date:  December 29, 2011
20             vs.                       )   Time:  9:00 a.m.
                                         )
21  GIUMARRA VINEYARDS                   )
    CORPORATION, a California corporation, )
22  and DOES 1-20,                       )
                                         )
23                Defendant.             )
                                         )
24  ─────────────────────────────────   )

25

26

27

28

# I.
## <u>INTRODUCTION</u>

In *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. __, 131 S. Ct. 2541 (2011), the United States Supreme Court significantly clarified the commonality requirement of Fed. R. Civ. P. 23(a) in such a way as to preclude the certification of all six of the proposed classes in Plaintiffs' Motion for Class Certification and Appointment of Class Counsel. *Dukes* has been described as "altering existing case law, " *Ellis v. Costco Wholesale Corporation*, 2001 U.S. App. LEXIS 19060 (9th Cir. 2011), and "representing a significant restatement of the commonality requirement." *Walter v. Hughes Communications, Inc*. 2011 U S Dist. LEXIS 72290 *20. Incredibly, although the Court's decision was issued a full month before Plaintiffs' Memorandum of Points and Authorities in Support of Class Certification ("Plaintiffs' Memorandum") was filed, there is no mention of the Supreme Court's decision in Plaintiffs' Memorandum.  More incredibly, plaintiffs repeatedly cite in support of certification the lower court's decision, which the Supreme Court reversed.

In the short time following *Dukes*, numerous wage and hour cases similar to the present case have been denied class certification based on *Dukes*.  *Dukes* eviscerates plaintiffs' motion for class certification, which is doubtless why they have ignored it.  But while plaintiffs may wish to hide from *Dukes* and the numerous subsequent cases following it, which overwhelmingly deny class certification, the courts have not.  In the lengthy period plaintiffs have before their reply is due, it is incumbent upon them to bring to the court's attention what will undoubtedly be a significant number of new cases applying

1    *Dukes* to deny class certification in similar cases as well as to explain their failure to bring

2    the Supreme Court's momentous decision to the court's attention in this case.

3        *Dukes* brings to an end the practice of certifying classes whose members are not all

4    affected in the same way by the challenged practices.  It is no longer permissible to do what

5

6    the plaintiffs are attempting in this case, which is merely to ask the court to determine

7    whether various claimed company practices are legal or not, without regard to whether

8    those practices were followed consistently, or whether all of the claimed members of each

9    class are similarly affected by those practices.  Here, even the named plaintiffs report

10   strikingly different experiences as to claimed off-the-clock work, meal and rest break

11   practices, and tool reimbursement policies.  The 77 declarations submitted by plaintiffs in

12

13   support of this motion also report a variety of different answers.

14       In opposition, defendant Giumarra Vineyards Corporation ("Giumarra") is

15   submitting more than 200 employee declarations that introduce a whole different set of

16

17   answers, nearly the opposite of plaintiffs' claims.  In addition, the declarations of three of

18   Giumarra's field superintendents demonstrate significant variations in the implementation

19   of company policies and practices.

20

21       These variations are not surprising, considering that Giumarra's business is

22   conducted in a decentralized manner such that individual superintendents applied work

23   rules differently over the vast spread of Giumarra's farming operations.  These kinds of

24   differences were fatal to class certification in *Dukes*, and should be deemed fatal in this case

25

26   as well.

27

28

At least two of the six proposed classes (one and six) also cannot be certified because they rest upon theories that were not advanced in the consolidated class action complaint.  As the Central District recently observed in denying class certification in a wage- hour case:  "certification is not a time for asserting new legal theories that were not pleaded in the complaint."  *Brown v. American Airlines, Inc.* 2011 U. S. Dist. LEXIS 99495 (C. D. CA.*35).  The novel theory that some piece work employees should be paid extra for taking rest breaks is not only unsupported by the law, it completely contradicts the complaint's allegation that these employees were <u>denied</u> rest breaks.  The claim that certain employees (those who worked in the cold storage areas) should have had scheduled meal breaks, instead of on-duty meals, also appears nowhere in the complaint, and applies only to a small number of employees, none of whom are among the named plaintiffs.

Class certification should also be denied in this case because the named plaintiffs present individualized grievances that do not match up well with the allegations of the complaint, or the claims asserted in this motion.  These special issues make them atypical of the employees they purport to represent, and render them unsuitable as class representatives.

In addition, plaintiffs' motion relies on the declaration of a proposed "expert" who admits that he is unable to form an opinion as to whether any of the violations that form the basis of the claimed classes occurred.  Plaintiffs have no evidence sufficient to prove any violations on a class-wide basis as to any of their proposed classes.  Individual issues clearly predominate over any class issues.  For these reasons, as well as additional reasons applicable to each individual proposed class, class certification should be denied.

## II.

## SUMMARY OF FACTS

A.      The Named Plaintiffs

The six proposed class representatives[1] demonstrate a variety of individual experiences with Giumarra.

Rafael Munoz worked for Giumarra only during the 2005 season (and also for a couple of weeks in 2001 or 2002). (Exhibit A to Markowitz declaration, pp. 12-13)  He quit near the end of the season because he was unhappy with the way his foreman treated the workers in his crew.  Munoz's grievances against Giumarra have little to do with the allegations of the complaint or with any of the proposed sub-classes.  For example, Munoz thought that his crew was worked too hard, and he was dissatisfied with some of the conditions in the field.  (Tr.16-17)  On the other hand, Munoz admitted that employees were provided tools.  (Tr. 42)

Santos Valenzuela quit working for Giumarra in 2006 because of pressures he felt at work, and divisions he perceived at the company as a result of the union campaign. (Markowitz decl. Exhibit B, Tr. 6, 20-21)  As to the proposed class claims, Valenzuela acknowledged that work starting times would vary depending on the field he worked in. (Tr. 49)  He also provided inconsistent testimony about Giumarra's tools policies.  (Tr. 64-65)

---

[1] Two additional proposed representatives have dropped out because they were unwilling or unable to testify at a deposition.  (Markowitz decl. ¶2)

Trinidad Ruiz worked for Giumarra from approximately 2001 to 2005, but also worked for Giumarra 20 or 30 years ago for another couple of years.  (Markowitz decl. Exhibit C, Tr.29)  He may have used an assumed name during that earlier period.  (Tr.26)  He testified at one point that he left Giumarra in 2005 because his supervisor was retaliating against him for union activity.  Like Munoz and Valenzuela, it appears that Mr. Ruiz has some particular grievances against Giumarra that do not relate to the claims in this case, and would distract from those issues.

Ramon Perales is still employed by Giumarra.  Perales claims that he had to work for free for two or three weeks when he was first hired in 2001, a claim that appears in the complaint, but is not part of any of the proposed classes.  Perales also claimed that he was forced to stop work for an hour or more a day nearly four days a week.  (Markowitz decl. Exhibit D, Tr.18)  He claimed that Giumarra never provided anybody any tools, so he and others were all compelled to buy their own clippers and trays and other tools every year.  (Tr.26)  Perales claimed that it took him and others an hour to clean their trays at home.  (Tr.28) (Others have testified that cleaning the trays only takes a few minutes.)  Because these allegations are so exaggerated and inconsistent with the testimony of many other witnesses, Mr. Perales also makes an unsuitable class representative, whose claims are not typical of the members of the proposed classes.

Hugo Rios was inconsistent during his deposition about the dates he worked for Giumarra, at first stating that he worked there from 2006 through 2009, even though the company's records show that he was employed from 2004-2007.  (Markowitz decl. Exhibit E, Tr. 5, 16)  There also appear to be some inconsistencies in these records, as one

employee information form is dated 2004 and another dated 2007.  Rios believed that his crew was singled out for harsh treatment because it contained some union sympathizers, including himself.  (Tr. 46-47)

Marta Rincon de Diaz worked for Giumarra, according to the company's records, for three years from 2004 through 2006.  Due to scheduling issues, defendants have not yet had the opportunity to depose this plaintiff, but have reserved the right, with plaintiffs' counsel's agreement, to submit a supplemental declaration providing further information regarding this proposed class representative.

None of the proposed class representatives worked in the cold storage areas, which allowed some on-duty meal breaks.  None of these named plaintiffs worked for any of the seasonal worker crews, which comprise the largest contingent of harvest workers.  Those seasonal crews are supervised primarily by David Stanley, whose practices particularly with respect to tools and lunch breaks, differ somewhat from other superintendents.  (See Stanley declaration ¶¶6-7)

None worked predominantly for piece rate.  Their testimony as to Giumarra's practices regarding providing employees with tools is all over the lot.  These class representatives' experiences and recollections with regard to alleged off-the-clock work also was so varied that these plaintiffs cannot be deemed suitable representatives for that proposed class either.

B.    The Declarants

Plaintiffs have submitted 77 declarations, many of which lack sufficient formalities to make them reliable.  (Carroll declaration ¶3)  More than half provide dates of

employment inconsistent with Giumarra's records.  Some are illegible, and some of the

translations are questionable.  (Carroll declaration ¶¶4-5)  Many do not indicate whether

the practice complained of occurred before or during the limitations period.  (That problem

was fatal in *Arrendondo v. Delano Farms Co.*, 2001 W.L. 1486612 (E.D. Ca.2011).)

Plaintiffs' selection of declarants is highly skewed toward certain crews, making it

difficult if not impossible to draw any conclusions from such an unrepresentative sample.

*Cruz v. Dollar Tree Stores, Inc.*, 2011 U.S. Dist. LEXIS 73938 (N.D. Ca)

Defendants have submitted 252 declarations from employees chosen from a much

broader sample of crews.  These declarations sharply contrast with the allegations of those

in the skewed sample submitted by plaintiffs.  (Carroll decl. ¶¶8-12)  All of these

declarants affirmed that employees were paid for all of the time that they worked.  All the

workers who did piece work affirmed that they made more than minimum wage for such

work.  None did significant "off the clock" time.  All of these witnesses affirmed that they

were allowed to take meal and rest breaks.  Nearly all of those declarants confirmed that

Giumarra provides them with all of the tools they use free of charge.

C.      Giumarra Vineyards Corporation

Giumarra is a family owned and managed farming business that is headquartered in

Edison, California, outside of Bakersfield, and has grown to be one of the largest table

grape growers and shippers in the United States.  (Jeff Giumarra decl. ¶2)

Table grape harvesting is a labor-intensive activity. At peak employment in the

summer, Giumarra employs approximately 3,000 employees, including more than 40

harvest crews.  Giumarra's table grape farming operations extend from Wheeler Ridge in

the South to Ducor in the North, a distance of about 75 miles.  Harvest crews vary in size and move from field to field, sometimes in the same day.  Unlike many table grape growers, Giumarra does not rely on labor contractors to supply its labor, instead choosing to have a direct, close and continuing relationship with its workers through its supervisors. (Jeff Giumarra decl. ¶3)

Unlike other large farming employers, Giumarra did not have an Employee Handbook setting forth employment policies and practices during most of the claimed class period from 11/9/2001 to present ("the class period").[2]  Moreover, unlike most other large farming employers, Giumarra did not have a Human Resources Director during almost all of the claimed class period.[3]  (Jeff Giumara ¶4)

There is no question that Giumarra had policies and practices following the applicable employment laws.[4]  Indeed, plaintiffs allege in their complaint that the employment laws claimed to have been violated were part of "the terms of the working arrangements made with Plaintiffs in California in violation of 29 U.S.C. § 1832(c); these working arrangements are contained in the IWC Wage Orders <u>which are required to be and are, actually posted and communicated to plaintiffs as required by the IWC Wage Orders.</u>" Plaintiffs' Complaint, ¶40(b) (emphasis added).  The Wage Orders are posted in the fields

---

[2] In not doing so, it was like Costco which had no written policies as to promotion, the subject of that litigation.  *Costco*, *supra*.  Giumarra put into effect an Employee Handbook covering many of these issues in 2010.

[3] Giumarra hired a Human Resources Director on July 28, 2011.  (Jeff Giumarra decl. ¶4)

[4] It always has been Giumarra's policy to comply with all federal and state labor laws, as is indicated by the fact that it posts notices regarding such laws.  *Valenzuela v. Giumarra Vineyards Corp.*, 614 F.Supp. 2d 1089, 1093 (E.D.Cal. 2009)

-9-

where the employees work.  Thus, despite the absence of a Handbook or Human Resources Director, defendants communicated to all employees the statutory and regulatory provisions upon which plaintiffs rely.  If defendant had not had these "working arrangements" under AWPA, there would be no federal jurisdiction.  *Valenzuela v. Giumarra Vineyards Corp.*, 619 F.Supp 985 (E.D.Cal. 2008).  Thus, for class certification purposes, plaintiffs must overcome the fact that every class member knew that it was part of their "working arrangement" that Giumarra comply with the employment laws involved in this case.  All of the claimed class members chose to work for Giumarra voluntarily and agreed to work under the terms of the applicable labor laws, which were "posted and communicated as required by the IWC Orders."

What distinguishes Giumarra from other large growers is its management structure. Defendant manages employees on a decentralized basis.  Instead of handbooks or Human Resources Directors, the employment practices were communicated to the foremen of more than forty crews (each of which had a foreman) by four or five superintendents, with Sal Giumarra, the company's president, also sometimes functioning as an additional superintendent.  (Jeff Giumarra decl. ¶5)  These superintendents had discretion and autonomy in performing their jobs, and relied upon and trusted the supervisors reporting to them, and the crew foremen, to decide best how to manage their crews.  By relying on long term employees and supervisors to get the work in the field done, Giumarra developed a reputation for high quality and productivity, with a low ratio of managers to workers. Giumarra achieved those goals through a decentralized, horizontal management, rather than centralized rules and office-based managers.

-10-

Employment policies were mainly communicated orally by the superintendents to the supervisors and foremen.  Giumarra has submitted declarations by three of these superintendents, Joe Giumarra, Leroy Kuntz, and David Stanley, revealing significant variations in their practices affecting the proposed classes.

Most of the records relating to Giumarra's wage and hours practices have been maintained, and are still maintained, in paper form.  (Jeff Giumarra decl. ¶7)  The most important documents used to track fieldworkers' hours are called field labor time cards, which show the daily and weekly hours and units recorded for each and every employee. Although the company also maintains sign-up sheets as a cross-check on the employees who reported to work each day, these sheets are not relied upon for the purposes of preparing payroll.  (Jeff Giumarra decl. ¶7)  The company's electronic records, which are used to prepare paychecks, do not, as the plaintiffs' expert has discovered, track meal and rest breaks, nor are they required to do that.

D.    The Six Proposed Classes

Two of the plaintiffs' proposed classes - - the unpaid rest break class and the piece rate overtime class - - involve workers paid on a piece rate.  These employees are all guaranteed to make at least minimum wage.  The vast majority make significantly more than minimum wage.  Giumarra maintains no records of the rest breaks taken (or skipped) by these employees.  Therefore it would require a process of person-by-person interviews going back ten years to determine how frequently these employees skip rest breaks, and that process seems unlikely to result in reliable information.  (Jeff Giumarra decl. ¶8)

-11-

1

2      Giumarra's records do not show overtime hours performed by piece rate workers, for

3  the simple reason that these employees are not permitted to and do not work overtime.

4  Stopping times for these workers are strictly enforced, and they are not permitted to stay in

5  the fields after work has stopped.  (Kuntz decl. ¶6)  Therefore, if any attempt were made to

6  determine whether some of these employees nevertheless violated these rules and

7

8  performed overtime work, that would also require an individualized fact-finding process.

9      Two additional proposed classes involve primarily hourly employees - the so-called

10 late meal break class and the off-the-clock class. The "late" lunch break class claim arises

11 from the company's practice prior to 2006, of generally scheduling lunch at noon, although

12 even during that period the policy was to schedule lunch within five hours after starting

13 times. (meaning that if work started at 7:00 a.m., as is true early and late in the season,

14 lunch would not be "late," and even if work started at 6:30 a.m., lunch might take place

15

16 before noon)  Since 2006, however, Giumarra has been more consistent in scheduling lunch

17 within five hours of starting time.  (Jeff Giumarra decl. ¶¶11-12)  During either time

18 period, however, it would be difficult if not impossible, to determine how often meals were

19

20 scheduled after five hours.  The sign-up sheets may not provide a reliable indicator of how

21 frequently meals take place after five hours.  (Kuntz decl. ¶8)

22

23     There are no records showing off-the clock work.  This claim apparently involves

24 instances where foremen or supervisors or superintendents conducted demonstrations

25 (known as "escuela") prior to the official starting time, or where there was preparation time

26 before or clean-up time after the scheduled work hours.  (Jeff Giumarra decl. ¶14)  Some

27

28

employees have also testified that they took trays home to wash, but the testimony varies tremendously as to the prevalence of this practice, and as to how long it takes to wash trays. (Joe Giumarra decl. ¶4, David Stanley decl. ¶8)  Giumarra's policies do not permit any work before or after the official starting or ending times, and the superintendents confirm that demonstrations rarely take place before the announced starting time.  (Kuntz decl. ¶3, Joe Giumarra decl. ¶3)  To ascertain whether these kinds of off-the clock activities nevertheless could have taken place on occasion would therefore require individualized fact-finding among different crews.

As to the so-called tool class, it is Giumarra's policy to provide all necessary tools for its employees, and that policy has been in effect through the proposed class period. Employees are not charged for tools.  Necessary tools, such as pruning shears or clippers, are supplied free of charge by the company.  Giumarra used to require a deposit for tools, but does not do that any longer.  (Jeff Giumarra decl. ¶15)  Some supervisors or foremen, however, do penalize employees who lose tools, depending on the circumstances, either by providing used clippers or other tools as replacements, or by requiring employees to replace lost or broken tools themselves.  (Stanley decl. ¶7)  These policies have changed somewhat over time, and also vary somewhat from superintendent to superintendent, and sometimes from crew to crew.  (Joe Giumarra decl. ¶5, Jeff Giumarra decl. ¶15)

The final proposed class--the "on-duty meal break class" --consists of approximately 50 employees who work in the cold storage and loading areas at peak season, performing a variety of different jobs.  Because the flow of work in this area varies depending on the volume and timing of trucks bringing fruit from the fields, and because the two shifts of

-13-

workers in this area overlap for only a few hours during the day, these employees cannot always predict when the work will slow down enough to allow them to take breaks, and therefore have agreed to take one of their meal breaks as an "on-duty" break.  (Peoples declaration ¶5)  None of the named plaintiffs worked in the cold storage areas.

## III.

## ARGUMENT

A.    Plaintiffs Cannot Satisfy the Requirements for Class Certification.

To be permitted to proceed as a class action, each proposed class must meet each of the following Rule 23(a) prerequisites:  (1) [T]he class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; and (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class.  Fed. R. Civ. P. 23(a).  If the Rule 23(a) criteria are satisfied, the proposed class must also qualify under at least one of the categories provided in Rule 23(b) before it may be certified as a class action.  In this case, plaintiffs seek certification under Rules 23(b)(2) and 23(b)(3).

Each of the Rule 23 requirements must be satisfied by a preponderance of the evidence.  See *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F. 3d 196, 202 (2d Cir. 2008).  The burden to prove each element is on the party seeking certification. See *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).  "Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule- that is, he must be prepared to

-14-

prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."). *Dukes*, 2011 U.S. LEXIS 467, *21.  Plaintiffs must show that questions of law or fact common to members of the class predominate and that a class action procedure is superior to other available methods for the fair and efficient adjudication of the claims. Failure to satisfy any element of Rule 23(a) or Rule 23(b) requires a denial of class certification.  *Rutledge v. Electric Hose & Rubber Co.*, 511 F. 2d 668, 673 (9th Cir. 1975). If the Court determines that, after resolution of the common issues, that substantial, individualized issues still remain to be resolved, then class certification is *not* appropriate. See, e.g., *In re Taco Bell Wage and Hours Actions, 2011 U.S. Dist. LEXIS 109169 (E.D.CA. September 26, 2011).*

In the present case, plaintiffs have attempted to meet their burden of proof through: (1) the declarations of a non-representative group of employees (which are contradicted by the declarations of more than three times as many employees as well as the testimony of management) and (2) the "opinion" of a purported expert who has declared that he cannot form an opinion on any of the critical issues in the case.

As demonstrated in the Carroll declaration submitted herewith, plaintiffs' declarations are highly unreliable.  Plaintiffs offer no information as to how the declarations were prepared, nor whether plaintiffs have submitted to the Court all the declarations they have collected.  Individually and as a group, they are vague and self-contradictory.

Plaintiffs have abdicated the "rigorous analysis" of the evidence required by *Dukes*, and have failed to satisfy their burden of proof as to any of the proposed classes under Rule 23.[5]

Plaintiffs make no claim that their declarations are representative of any of the classes, but even if they did, *Dukes* precludes certification based on extrapolation even from a representative sample.  In *Cruz, supra*, the district court observed that "[t]he appropriateness" of plaintiffs' central proof – "representative testimony from a handful of class members" – while once "a questionable proposition under this circuit's case law" is "now untenable in light of the Supreme Court's decision in *Dukes*.  (*Id*. at *4)  *Dukes*, the *Cruz* court explained, "provides a forceful affirmation of a class action plaintiff's obligation to produce common proof of class-wide liability in order to justify class certification" (*Id*. at *5), and "the failure of Plaintiffs here to offer a basis for extrapolation from representative testimony to the class as a whole is fatal to continued certification" (*Id*. at *8).[6]  Moreover, as the court noted in *Cruz*, insufficient anecdotal evidence across a proposed class--particularly where the proposed class involves employees operating out of decentralized large geographic region, as is the case here--precludes a finding of a common practice. See, *Dukes* 2011 U. S. LEXIS 4567 at *34.

_____

[5] Because Plaintiffs have proposed six classes, a detailed discussion of the applicable law is combined with a discussion of the facts relating to the proposed classes.

[6] In addition to *Dukes*, the *Cruz* court relied on the Ninth Circuit's decision in *Mario v. United Parcel Serv., Inc.,* F.3d 943 (9th Cir. 2011).  As in *Cruz*, the *Mario* plaintiffs' "primary evidence" was "the testimony of individual class members" and the Ninth Circuit confirmed "the impropriety of relying on representative testimony where plaintiffs have provided  no reliable means of extrapolating that testimony to the class as a whole." (*Ibid*.)

To establish commonality, plaintiffs must prove the existence not just of common questions, but of questions that will generate common answers that will resolve the class claims. *Dukes*, 131 S. Ct. 2541, 2550-51. The Ninth Circuit recently elaborated on the Court's commonality requirement: "Plaintiffs must have a common question that will connect many individual promotional decisions to their claim for class relief." *Ellis v. Costco, supra* at 17710.  As the Supreme Court explained in *Dukes*, class treatment is appropriate only where the "claims…depend upon a common contention" that is "capable of classwide resolution-which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. at 2551.

> What matters to class certification… is not the raising of common "questions" – even in droves – but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. <u>Dissimilarities within the proposed class are what have the potential to impede the generation of common answers</u>." *Nagareda, supra, at 132*.

*Id*. at 2551 (emphasis added).  The dissimilarities within the purported classes here, demonstrated by the 252 declarations submitted by defendant and the 77 declarations submitted by Plaintiffs, are a fatal impediment to "the generation of common answers."

Moreover, none of the claims asserted by plaintiffs' proposed classes, like the class claims decertified in *Dukes*, depend upon common contentions capable of classwide resolution.  Instead, the determination of liability hinges on highly fact-intensive, individualized issues.  As noted above, plaintiffs completely ignore the Supreme Court's decision in *Dukes* and cite only the Ninth Circuit decision that was reversed by the Court. (See Plaintiffs' Memorandum 15, 16, 18).  Thus, plaintiffs can no longer rely on such formulations as "to establish commonality, 'the existence of shared legal issues with

-17-

1   different factual predicates is sufficient, as is a common core of salient facts coupled with

2   disparate legal remedies.'" (citation omitted).  Plaintiffs' Memorandum, 18: 2-4.

3         In denying a class certification motion, the Ninth Circuit recently ruled:  "[I]t is

4   insufficient to [as Plaintiffs here do] merely allege any common question…."  *Ellis v.*

5   *Costco*, *supra* at 17709-10.  Similarly, the Northern District of California recently stated

6

7   "an allegation that all putative class members suffered, 'a violation of the same provision of

8   the law' is not sufficient." *In re Wells Residential Mortgage Lending Discrimination*

9   *Litigation*, 2011 U.S. Dist. LEXIS 99830 (N. D. Cal. 2011). (Emphasis added).  See also

10  *Brown v. American Airlines, Inc.*, *supra*.  *Dukes* clearly repudiates such a low standard for

11  commonality and imposes the strict standard of issues-generating common answers that

12

13  will resolve the class claims, which precludes dissimilarities among the proposed classes.[7]

14        Plaintiffs themselves define the common issues for each of the proposed six classes

15  solely in terms of the legality of the defendant's claimed actions.  For example, as to

16

17  proposed class one ("The Unpaid Rest Break Class"), plaintiffs state the common issues as:

18              (1) Whether Giumarra's policy of paying a piece rate without paying
                employees any wages during rest breaks violated California rest-break laws
19              and AWPA; and (2) whether Giumarra's policy of paying a piece rate without
                paying employees at least the minimum wage for rest-break time violates
20              California's minimum wage laws and AWPA; and (3) whether Giumarra's
                policy of paying a piece rate without paying employees their "regular rate"
21              during rest breaks violates California labor laws and AWPA.
22

23

24  [7] *Delagarza v. Tesora Refining and Marketing Co.*, 2011 U.S. Dist. LEXIS 101127 (N.D. Cal.
25  2011) distinguished *Dukes* on the grounds that the plaintiffs all worked in the same facility and
    were subject to the same centrally administered policy.  Moreover, the court in *Delagarza* found
26  that exceptions to the challenged policies were rare, so that the common issues generated by the
    common policy predominated.  The commonality and predominance found in *Delagarza* are
27  completely lacking here.

28
                                        -18-

Plaintiffs' Memorandum, 1:14-19, 2:1.

As to the second proposed class ("The Late Meal Break Class"), plaintiffs describe the common issues as "whether the late meal breaks and failure to pay premium and wages is unlawful." Plaintiffs' Memorandum, 2:15. As to the third proposed class (the "Piece-Rate Overtime Class"), plaintiffs frame the common issue as "whether Giumarra's policy of paying piece rate without adjusting it to account for overtime hours worked violates California laws and AWPA." Plaintiffs' Memorandum, 3:17-18. As to plaintiffs' fourth proposed class ("The Off-the-Clock Class"), plaintiffs describe the common issues as:

> (1) Whether the burden of proof will shift to Giumarra for failing to record this pre and post-shift time; (2) whether pre and post-shift time, which is either required or knowingly permitted, is compensable; and (3) whether the failure to record pre and post-shift work violated AWPA.

Plaintiffs' Memorandum, 4: 17-21. All of these questions are purely legal and even if answered, would not resolve the off-the-clock claim, which is highly dependent on individualized factual inquiries. As to plaintiffs' fifth proposed class ("The Tool Class"), plaintiffs did not attempt to identify a common issue. As to the sixth proposed class (the "On-Duty Meal Break Class"), plaintiffs describe the common issue as "whether the on-duty meal break policy is lawful…." Plaintiffs' Memorandum, 5: 14-15.

Answers to these questions would resolve nothing other than whether plaintiffs have stated a claim for relief. (Even there, as will be shown below, the answer to the legality question is "yes" for at least two of the proposed classes.) Answers to these legal questions would not even begin to determine whether these claims are capable of class-wide resolution. Resolution of these legal issues will not establish commonality because the determination of liability for each class hinges on highly fact–intensive, individual issues.

-19-

Plaintiffs' inability to articulate any but purely legal issues to establish commonality for all six of its proposed classes therefore requires denial of all six certification requests.  See *In re Wells supra*.  At most, plaintiffs have merely alleged common questions, an exercise that requires denial of their motion.  *Ellis v. Costco*, *supra*.

In addition to commonality, plaintiffs must also establish typicality as to each proposed class. The class representative "must be part of the class and suffer the same injury."  *General Telephone Co. v. Falcon*, 457 U.S. 147, 156 (1982) (emphasis added). See *also Harlon v. Chrysler Corp*., 150 F. 3d 1011, 1020 (9th Cir. 1998).

> The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Dataproducts*, 976 F. 2d 497, 508 (9th Cir. 1992) (Emphasis added).

As this court recently noted: "If there is no evidence that the class was subject to the same practices or policy . . ., there is no question common to the class."  In re *Taco Bell Wage and Hour Actions*, 2011 U.S. LEXIS 109169 (E.D.Cal. 2011).  See also *Washington v. Joe's Crab Shack*, 271 F.R.D. 629, 636 (N.D. Ca. 2010).  In *Garcia v. Sun Pacific*, 2008 WL 2073979 (E.D.Cal. 2008), aff'd., 359 Fed.Appx. 724 (9th Cir. 2009), the court held that "the representative claims are not typical of the class members, because violations did not occur as to some class members."   In this case, the substantial number of declarations submitted by defendants demonstrates that violations did not occur as to some class members so that the representatives claims are not typical.  See also *Hadjavi v. CVS Pharmacy,* 2011 U.S. Dist. LEXIS 86341 at*10 (C.D. Cal. 2011).  In addition, the named

-20-

plaintiffs do not contain members of all of the proposed classes, and cannot speak to the practices of all of the various superintendents and crews.

Plaintiffs must also satisfy the numerosity requirement for each proposed class. It is an issue for the "on-duty meal break" class, which consists of relatively few employees. But it is also an issue even for the larger groups of fieldworkers and piece rate workers because plaintiffs have not sufficiently identified and demonstrated the existence of the numbers of persons who might be able to make such claims. "The Court will not rely on the cursory allegations of Plaintiffs. Plaintiffs must show some evidence of or reasonably estimate the number of class members. Mere speculation as to satisfaction of this numerosity requirement does not satisfy Rule 23(a)(1)." *Nguyen Da Yen v. Kissinger* 70 F.R.D. 656, 661 (N.D. Cal. 1976). "If speculation were the standard, the Court would find Plaintiffs have met their burden under this prong. But speculation is insufficient. <u>A higher level of proof than mere common sense impression or extrapolation from cursory allegations is required</u>." *Schwartz v. Upper Deck Company*, 183 F.R.D. 672, 881. (S.D. Cal. 1999) (emphasis added). See also *Aho v. Americredit Financial Services, Inc.*, 2011 U.S. Dist. LEXIS 80426 *23 (S.D. Cal. 2011) (denying class certification because of plaintiffs' failure to present evidence on numerosity factors).

Defendant will now demonstrate the lack of some or all of these required factors – numerosity, typically and commonality – as to each of the six proposed classes, which requires that none of these proposed classes should be certified.

B.     Plaintiff's Proposed "Unpaid Rest Break Class" is Not Certifiable.

   1.   The Claim Was Not Pleaded and Is Not Viable.

   Plaintiffs propose a class composed of "All fieldworkers employed by Giumarra who were paid a pure piece rate at any time between 11/9/2001 to the present." Plaintiffs' claim that the members of this class are entitled to be "separately compensated at an hourly rate no less than the minimum wage for the time they spent taking rest breaks." Plaintiffs' Memorandum, 19: 12-13.[8]

   This claim is not contained in plaintiffs' complaint and certification should be denied on this basis alone: "Certification is not a time for asserting new legal theories that were not pleaded in the complaint." *Brown v. American Airlines*, *supra*.

   In any event, there is no basis for such a claim in Wage Order No.14 or elsewhere. Wage Order No. 14 provides that employers need only "authorize and permit" employees to take ten minute rest periods at certain specified times and that "authorized rest period time shall be counted as hours worked for which there shall be no deduction in wages." Wage Order No. 14, ¶12. Plaintiffs do not claim that Giumarra has deducted any amounts from the wages paid to piece work employees for "authorized rest period time." Wage Order No. 14 does not require that an employer make a separate payment for rest period time or compute the wages due employees for authorized rest periods separately in determining the wages to be paid employees. Indeed, the fact that the Wage Order does not require that rest periods (unlike meal periods) be separately recorded confirms that no separate

_____

[8] Plaintiffs do not seek certification of a class of employees to whom rest periods have allegedly been denied.

compensation be paid for rest periods.  (IWC Order No. 14, ¶7.)  Section 7(A)(6) of Wage Order No. 14 authorizes the use of piece rates and provides simply that when such rates are used, the rates must be provided to employees and accurate production records be maintained.  There is no allegation here that the employer did not comply with Section 7(A)(6), the only section of Wage Order No. 14 that deals specifically with piece rates.

Giumarra guaranteed that all employees- -whether paid purely piece rate or hourly plus piece rate-- would be paid at least minimum wage for all hours worked.  (Jeff Giumarra Decl. ¶8)  Giumarra's payroll system tracked the hours worked and the pay for each employee for each work week.  If an employee's compensation at the end of the work week (hourly and/or piece rate) was not sufficient to result in the payment of at least the minimum wage for all hours worked, the employee received an additional "true-up" payment to ensure that minimum wage was paid for all hours worked. *Id*.

Giumarra's practice fully complied with California law.  Specifically, Wage Order No. 14 provides in Section 4(b) "Minimum Wage" that:

> Every employer shall pay to each employee, on the established payday for the period involved, not less than the applicable minimum wage for all hours worked in the payroll period, whether the remuneration is measured by time, piece, commission, or otherwise.

Piece-rate wages are similar to commissions, which are not "fixed… by the standard of time," (8 Cal. Code Regs., § 11090, § 2(Q)), but based on the employee's production during the pay period, which necessarily includes both productive and non-productive periods. The piece work rates for the "pure piece rate" employees included payments for authorized rest periods.  The time cards for "pure piece rate workers" show the number of units

1   produced and applicable piece rate for an entire day.  There is no record of whether rest

2   periods were taken or, if taken, their length.

3       None of the cases cited by plaintiffs support the relief sought here: "compensation of

4   piece rate employees at an hourly rate of no less than the minimum wage for the time they

5   spend taking rest breaks."  (Plaintiffs' Memorandum, 19: 12-13).  Plaintiffs misrepresent

6   
7   *Armenta v. Osmose*, 135 Cal. App. 4th 314 (2d Dist. 2005), as "holding that where a piece-

8   rate method of compensation is used, the employer is required to pay at least the minimum

9   wage for each hour worked."  (Plaintiffs' Memorandum, 19: 12-13).  *Armenta* involved

10  hourly, not piece-rate workers, and did not involve rest periods.  Moreover, the court did

11  not rule that employees had to be paid for the unpaid time at the minimum wage.  It ruled

12  that the employees had to be paid at the contractual wage scale at which "nonproductive"

13  time was to be paid.  *Id.* at 320-324.

14      Similarly, *Ontiveros v. Zamora*, 2009 U.S. Dist. LEXIS 13073 (E.D. Cal. 2009), the

15  
16  only other case plaintiffs rely upon to support this claim, did not involve an employer like

17  Giumarra with a "true-up" payment, ensuring that the minimum wage is paid for every hour

18  worked.  Moreover, the court did not rule that a pure piece rate policy that did not pay

19  
20  separately for work breaks was unlawful.  If simply held that, "It appears that plaintiff has

21  alleged a valid theory of recovery on this issue such that judgment on the pleadings is not

22  appropriate."  *Id.* at *8.  Indeed, the court expressly noted that it was possible that the

23  employer was correct that its piece-rate compensation policy was lawful, but that it could

24  
25  not make that determination based solely on the pleadings under Fed. Civ. P. 12 (c) and

26  wanted to give the plaintiffs the opportunity to develop evidence on the issue:

27  

28  

-24-

> "[E]ven if defendant[ ] … is correct, it would not be proper to grant their motion. It is simply not the case that there are no possible set of facts consistent with plaintiff's allegations that would permit his recovery… If defendants are correct, that a piece rate system is lawful so long as an employee is paid minimum wage for times during which he is precluded by his employer from earning a piece rate, it is appropriate to permit the plaintiff to conduct discovery in order to develop facts on this issue."

*Id.* at 14 – 15 (emphasis added).

### 2.   The Claim Lacks Numerosity.

Plaintiffs have not identified one piece rate worker who took a rest break and was not paid as they now claim he or she should have been.  Not one of the named plaintiffs has given any evidence that they were denied such pay and none of plaintiffs' declarants has testified that they were denied such pay.  At least one has testified that he never took rest breaks.

While there is no fixed number to satisfy the numerosity requirement, generally classes consisting of more than forty members are more likely to be approved.  *Cox v. American Cast Iron Pipe Co.*, 784 F. 2d 1596, 1553 (11th Cir. 1986).  Plaintiffs have identified zero pure piece rate workers who were not paid properly for their rest breaks.  The fact that Giumarra does not pay pure piece rate workers an additional amount for rest breaks does not establish that any putative class members, much less forty, fall into that category.

Plaintiffs' expert admits that there is no way to determine the times rest periods were taken (or whether they were taken). (Woolfson Decl., ¶¶16, 18).  Woolfson admits that he is "not a statistician" (Woolfson Decl. ¶5) and does not (and is not qualified to) make estimates based upon sampling (*Id.*).  He complained about the state of Giumarra's payroll records, but did not claim that Giumarra's recordkeeping failed to comply with the law.

-25-

Accordingly, Woolfson is unable to testify as to whether any pure piece rate workers took any rest periods and if so, when they took them, or how long they took.  In short, plaintiffs have introduced no evidence that <u>anyone</u> falls within the first proposed class.[9] Moreover, as was recently observed in a post-*Dukes* decision:

> The four explicit requirements of *Rule 23(a)* imply a fifth:  that the identities of the class members are reasonably ascertainable by reference to objective criteria.  See *In re Initial Public Offering Sec. Litig.,* 471 F. 3d 24, 44-45 (2d Cir. 2006) ("In re IPO") (quoting *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liability Litig.,* 209 F.R.D. 323, 337 (S.D.N.Y. 2002)).

*United States v. City of New York*, 2011 U.S. Dist. LEXIS 13660 at  4 (E.D.N.Y. 2011). Plaintiffs have done nothing to meet that burden.

This failure, together with the absence of substantial anecdotal evidence supporting plaintiffs' class, is fatal to the requirement that the court have a reasonable basis for finding numerosity.  While the court may not put the plaintiff to preliminary proof of his claim, it does require sufficient information to form a reasonable "judgment."  *Id*.  "Reasonable judgments cannot be made out of thin air;  sufficient information to make such a judgment is a required preliminary step."  See e.g. *Marcial v. Coronet Ins. Co.*, 880 F. 2d 954, 957 (7th Cir. 1989) (plaintiffs need not specify exact numbers in class but cannot rely on conclusory allegations and speculation as to the size of the class); *Polich v. Burlington Northern Inc.*, 116 F.R.D. 258, 261 (D. Mont. 1987).  Here plaintiffs have provided no

---

[9] Plaintiffs' assertions in their memorandum that "The electronic payroll system confirms the anticipated policy that rest breaks are not paid and that  the payroll database confirms that premium rest-break wages are not provided" (Memorandum, pp. 2, 5-7) are false.  The assertions are claimed to be based on the testimony of Plaintiffs' expert, but he did not testify as to even one specific instance where an employee was not paid for a rest period.  He could not because the payroll records he examined contain no information as to rest periods.

information that would permit the court to identify how many members would belong to this class.

3.    <u>The Claim Lacks Commonality.</u>

Plaintiffs' unpaid rest break class claim is inconsistent with plaintiffs' complaint, which alleges that Giumarra required "non-exempt employees to work <u>without</u> providing a minimum ten (10) minute rest period rest period…" Complaint, ¶21 (j).  See also ¶¶72-75. (emphasis supplied)  Nowhere in the complaint do plaintiffs complain on behalf of employees who <u>were</u> provided rest breaks.  If plaintiffs were denied rest breaks, how can they be owed the minimum wage for time spent working them? This blatant inconsistency is fatal to the required commonality.  The pure incentive employees who took ten minute rest breaks are claiming ten minutes pay at the minimum wage while the employees who claim they were denied rest breaks (not a proposed class) are claiming one hour's pay for each day they were denied the rest break.  Both groups have conflicting interests: some members of the class took rest breaks and others did not.  Such conflicting interests destroy commonality.

4.    <u>Individual Factual Questions Predominate.</u>

As described above, individual questions as to whether a pure incentive employee took a rest break predominate over every other factual issue raised by plaintiffs' first purported class and requires that it not be certified.  The competing rest period claims and competing evidence as to the timing and length of rest periods, predominate over any common factual issues.

There is no written record as to whether rest periods are taken and, if so, when they were taken and for what length of time.[10]   Accordingly, it is difficult to see how such questions could be answered.  The innumerable individualized inquiries on a daily basis throughout the class period required would completely outweigh the supposedly common question of the proper rate of pay for rest periods that were taken.  Accordingly, individual questions predominate over common questions.

    5.    A Class Action Would Not be Superior to Any Other Method of Adjudication.

    Since there is no record of which pure incentive employees actually took rest periods and when they took them, there is no way to determine how much, if anything, would be owed under plaintiffs' theory to any of the pure piece work employees.  None of the named plaintiffs testified in their declarations that they took any rest periods while working on pure piece rate.  None of the declarations submitted by plaintiffs specified that they took rest periods while they were working on a pure piece rate. Indeed, plaintiffs have claimed they were denied rest periods.  There certainly is no way of determining which or how many of the employees in the proposed first class are entitled to rest period pay under plaintiffs' novel legal theory.  This is fatal to proving that a class action is superior.

_____

[10] California law does not require employers to record rest periods.  Cal. Code Regs. title. 8, § 11140.

C.      Plaintiffs' "Late Meal Break Class" is not Certifiable.

        1.      There is No Basis for a "Late Meal Break" Claim.

        Plaintiffs propose a class consisting of "All fieldworkers employed by Giumarra from 11/9/2001 to the present."  Plaintiffs assert that the class is based on California law which "requires that meal periods be provided within 5 hours of work" citing California Labor Code § 512 and IWC Wage Order 14.  Plaintiffs' Memorandum, p. 2, n.7.

        There is no legal basis for plaintiffs' claim that allegedly "late" meal breaks are unlawful.[11]  Labor Code § 554 specifically provides that, "This chapter [which includes § 512] … shall not apply to any person employed in an agricultural occupation, as defined in Wage Order No. 14 …."  IWC Wage Order No. 14 provides in Section 11:

> Every employer shall authorize and permit all employees after a work period of not more than five (5) hours to take a meal period of not less than 30 minutes, except that when a work period of not more than six (6) hours will complete the day's work the meal period may be waived by mutual consent of employer and employee."

Nothing in this provision requires that the meal period be taken by any particular time.  The 5-hour benchmark defines the threshold point at which an employee becomes eligible for a meal period.  According to the plain language of § 11, the 5-hour marker relates to the overall length of the "work period," not to the timing of the 30-minute meal break.  The timing of the meal period within a work period of "more than five hours" is completely

_____

[11] Plaintiffs' assertion that "Giumarra's does not dispute the untimely meal breaks" (Plaintiffs' Memorandum, 2:18) is false, Giumarra had a practice of scheduling meal periods to begin at noon until 2006. But the scheduling of meal periods at noon was not unlawful and these meal periods were not "untimely." Moreover, as is discussed below, the practice was not consistent from crew to crew or season to season.

-29-

beyond the scope of the regulation.  Plaintiffs cite no case or DLSE Opinion letter

upholding a "late meal break claim."  We are aware of none.

> 2.   Plaintiffs' Proposed "Late Meal Break" Class Lacks Commonality and
> Typicality.

Even if there were a legal requirement that meal periods be scheduled

immediately after or within the first five hours of work, the plaintiffs have not met their

burden of proving commonality within the purported class.  Plaintiffs rely heavily on a

claimed company practice of scheduling meal breaks at noon before 2006. It is well

established that such practices do not establish the required commonality.  *Mevorah v.*

*Wells Fargo Home Mortg. (In re Wells Fargo Home Mortg.),* 571 F.3d 953, 959  (9th. Cir.

2009) [12]  (blanket exemption policy does not establish that class claims predominate, where

an individual inquiry is still needed to determine whether employees fall within exemption)

In this case, the general practice before 2006 of scheduling lunch at noon was

applied by superintendents and foreman on a flexible basis. For example, according to

David Stanley, the superintendent of the largest number of crews (from 650 to over 1,000

---

[12] See also*: Weigle v. FedEx Ground Package System, Inc*., 2010 U.S. Dist. LEXIS 33305, *22
(S.D. Cal. 2010);  *Vinole v. Countrywide Home Loans, Inc*., 571 F. 3d 935 (9th Cir. 2009); *Mendoza
v. Home Depot, USA, Inc.,* 2010 U.S. Dist. LEXIS 13025, *23, 31 (C.D. Cal. Jan. 21, 2010)
(denying certification in spite of the plaintiffs' contention that all class members followed the same
"standard operating procedures"); *Pablo v. Servicemaster Global Holdings, Inc.,* 2009 WL
2524478, *6 (N.D. Cal. 2009) (class certification not appropriate where parties submitted class
member declarations showing variation in how they spent their time); *Howard v. GAP, Inc.,* 2009
U.S. Dist. LEXIS 10596, *11-13 (N.D. Cal. Oct. 29, 2009) (individual issues predominated where
the alleged "common" policy was a lawful written policy that plaintiffs claimed was modified by
an unwritten unlawful policy); *Whiteway v. FedEx Kinkos Office and Print Sycs., Inc.,* 2009 U.S.
Dist. LEXIS 127360 (N.D. Cal. 2009) (decertifying class action on grounds that plaintiff could not
show how the testimony of 10-20 class members could be extrapolated to the class).

employees), the time of the meal breaks is determined by when the "lunch trucks" arrive.[13]

Stanley Declaration, ¶7.  According to Stanley:

> Sometimes the truck does not arrive at 11:30 as needed, so we cannot take lunch until the truck arrives, which might not be until 15 or 30 minutes later.  So the only consistent thing I can say about lunch is that lunch is taken when the lunch truck arrives.  That time may vary from day to day and from crew to crew.

Stanley Declaration, ¶7.

Thus, within the collection of the largest crews at Giumarra, there is no consistency as to when the meal break is taken: "That time may vary from day to day and crew to crew."  It is hard to imagine stronger evidence of lack of commonality.  And the reason for the lack of commonality is unique to this group of workers, destroying the possibility of the common answer required for class certification under *Dukes*.

Plaintiffs' own expert was unable to testify as to even one example of a pre-2006 meal period being taken more than five hours after work commenced. The few examples offered by plaintiffs in no way confirm the existence of a uniform practice and defendant has produced over 1800 examples from this period of the meal periods for field workers beginning less than five hours after the start of work.  (Decl. of Jeff Gium. ¶14)

There is no dispute that defendant tightened up its general practice of scheduling meal periods for fieldworkers in 2006.  Plaintiffs acknowledge this difference within the class by asserting (though grossly exaggerating) that prior to the scheduling change in 2006, "any time an employee began a shift prior to 7:00 am, his or her lunch was not compliant

---

[13] His crews travel from Coachella and live in labor camps for three months.  Stanley Declaration, ¶ 2.  Giumarra provides the employees' food.

with California law."  Plaintiffs' Memorandum, 3: 2-3. (emphasis added).  Plaintiffs go on

to assert that after the scheduling change in 2006, "employees often were scheduled to take

late meal breaks…."  (Plaintiffs' Memorandum, 3:4). (emphasis added).  These alleged

differences destroy any commonality in a proposed class covering the period "from

11/9/2001 to the present.  Common policies are not sufficient to establish the commonality

required by *Dukes,* but here, Plaintiffs are alleging uncommon policies within the purported

class.

Plaintiffs' evidence relating to claimed "late" meal periods prior to the 2006 change

is far from complete. Whether lunch was "late" often depended on the time work started.

Giumarra has over 40 crews, from which plaintiffs have produced only a partial sampling,

that do not always start work at the same fixed time. Field conditions, weather, the

condition of the grapes, the time of sunrise, and other factors, not management edicts,

determine starting times.

Plaintiffs' only other evidence supporting its "late" meal break claim after 2006 are

two sets of employee sign in sheets.  The first covers one crew composed of 16 employees

for November 29, 2009.  See Petitioners' Memorandum, 3, n. 10, referring to Exhibit 6 of

the deposition of Jeff Giumarra.[14]  The second covers three crews on May 31, 2009.

Defendant has submitted 252 Declarations from putative class members, all of which state

that the lunch break in harvesting starts at 11:30 am.  As one court recently observed in

another wage hour case in denying certification because of a lack of commonality, such

---

[14] Exhibit 6 to Mr. Giumarra's deposition consisted of two sheets, pages 2 and 20 of Document 61.
The version of Exhibit 6 submitted consists of 35 pages, only two of which were actually made part
of the exhibit at the deposition.  Accordingly, Exhibit 6 should be stricken.

opposing declarations are entitled to great weight: "WinCo's best evidence of individual variation in the AMs' jobs is the thirty-six declarations it submitted of putative class members, representing more than three times the number of declarations submitted by Plaintiff…." *Gales v. WinCo Foods, 2011 U.S. Dist. LEXIS 96125 . * 22-23.*  Giumarra has submitted more than three times as many declarations as plaintiffs.

The other documents submitted by plaintiffs as part of Exhibit J were "sign-in sheets" filled out in the fields.  See Declaration of Jeff Giumarra, ¶14.

Superintendent David Stanley explained:

> We use sign-in sheets in the fields mainly for the purpose of cross-checking the names of the workers who show up for work each day.  We also record starting, stopping, and lunch times on those sign-in sheets, but not rest breaks.  The sign-in sheets are not used for the purposes of recording hours of determining pay.  That is what the time cards are far.  Therefore, <u>the sign-in sheets are not a reliable indicator of when, for example, lunch might actually be taken.</u>  I have seen cases where the sheets indicated that lunch was taken at noon, but it might have been taken before noon.

Stanley Declaration, ¶10. (Emphasis added).

Superintendents Joe Giumarra and Leroy Kuntz testified to the same effect.  Joe Giumarra Declaration, ¶6; Leroy Kuntz Declaration, ¶8.  Moreover, the documents in plaintiffs' Exhibit J confirm that the scheduling of meal breaks in 2007 varied substantially from crew to crew.  Thus, the crew shown on Document 61, p. 2 took their meal break from 11:30-12:00.  More importantly, of the 58 examples provided in plaintiffs' Exhibit J, of "late lunches" after 2006, 35 are from tractor drivers and irrigators who are not part of the proposed classes.

The second set of documents offered by plaintiffs (Giumarra Deposition, Exhibit 8) relate to a crew working on May 31, 2008, which received their meal period from 11:00 am to 12:00 noon.  Thus, the only documentary evidence presented by the Plaintiffs as to the post-2006 meal period scheduling shows that the scheduling varied from crew to crew.

Plaintiffs selected a few sign-in sheets from hundreds provided by Giumarra.  Since they were not selected so as to develop a statistically valid sample, they have no probative value.  As plaintiffs' expert states" "I am not a statistician.  I do not attempt to draw conclusions as to whole data populations based upon data sample."  Woolfson Declaration, ¶5.

Mr. Woolfson was provided all of Giumarra's payroll data and he concluded that "there are no time entries in the data to show start and stop of meal and rest breaks were provided to employees."  *Id*. at ¶18.  This admission by itself is fatal to the certification of plaintiffs' late meal period class, as the only other evidence supporting certification is anecdotal from a small fraction of the employees, none of whom testify that they were forced to take late lunch breaks.  Further, the late lunch break claim is contradicted by the testimony of 252 employees in their declarations.

Thus, plaintiffs have not met their burden under *Dukes* to "affirmatively demonstrate" the existence of a "common contention" that is capable of classwide resolution."  *Dukes*, 131 S. Ct. at 2551.  There are no common answers to the questions whether employees took "late" meal periods for the period from 11/9/2001 to the present and the reasons they did so.  Many of the employees in the purported "late lunch" class are also claiming denial of meal breaks (See Complaint ¶¶68-71).  According to the court's

-34-

prior ruling in this case: "As a statutorily protected right, the decision to forego a meal period must be made personally by each worker on a daily basis.  The decision to forego a meal period may not, therefore, be based on a specific requirement of the employer or on a policy or practice…." *Doe v. D.M. Camp & Sons*, 2009 U.S. Dist. LEXIS 33504  * 16.  Thus, there would have to be an individualized inquiry as to why any "late lunch" class member might have decided to forego the meal break entirely on a particular day.  If the employee did not take a meal break, he or she would not be a member of the purported "late lunch" break class.  The same individualized inquiry would have to be made of employees who decided to delay taking their lunch.

Variable implementation of standards defeats commonality since an independent factual inquiry would be needed with respect to how individual foremen scheduled employees' meal breaks every day and at each location.  *Dukes*, 2001 U.S. LEXIS 4567 at *30-31; see also *Arrunategui v. ConocoPhilips Co*., 2010 U.S. Dist. LEXIS 142237 at *15-16 (C.D. Cal. 2010)  (no commonality where independent factual inquiry is needed with respect to the implementation of policy at each facility) *Temple v. Guardsmark LLC*, 2011 U.S. Dist. LEXIS 21100, *18 (N.D. Cal. 2011) (commonality defeated where employees' understanding of the company's policies of rest breaks would "need to be asked and asked again on an employee-by-employee, site-by-site, or supervisor-by-supervisor basis." )

Nor does defendant's "payroll database" provide the required common proof.  As plaintiffs' expert testified, "whether an event occurred in the data (such as a meal period or rest break [if such data is provided], when the event occurred [such as the time, day, month, and year] and the persons associated with the event [such as the employee]."  (Woolfson

Declaration, ¶9).  The data contained in the files examined by Mr. Woolfson "were not timekeeping, but rather were sums of hours that had been paid to employees based upon time from hand-written records." *Id*. at ¶14.  Mr. Woolfson examined only three files in Excel format and did not examine the written records which defendant provided to plaintiffs.  (*Id*. at ¶11).

According to Mr. Woolfson:

> Giumarra data is clearly deficient for almost all purposes of analyzing wage and hour violations and to the extent to which it fails to include original employee punch data and only reflects manager edited data does not reflect the actual contemporaneous, original evidence in this case.  Woolfson Declaration, ¶17.

As a result, Mr. Woolfson declared "that there is no way to determine from the data that a lunch was missed or not taken, since meal periods do not appear in the data. (*Id*. at ¶16).  Thus, "there are no time entries in the data to show start and stop of meal and rest breaks were provided to employees."  (*Id*. at ¶18).  Accordingly no common proof as to the time of meal periods is available from defendant's payroll database.

While plaintiffs allege in their complaint that defendants failed to comply with various record-keeping requirements, they have produced no evidence supporting their claims. Maintaining records on paper is not a violation of any law. Plaintiffs make no complaint that any of the documents requested by them were not supplied.  Since Mr. Woolfson's claimed expertise in only in analyzing computerized databases (Woolfson Declaration, ¶5) and since the critical information as to plaintiffs' second claimed class does not appear in any computerized database, his testimony provides no evidence supporting plaintiffs' claim.  Moreover, since he is not a statistician (Woolfson Declaration,

-36-

¶5), Mr. Woolfson is not capable of drawing conclusions from a sample of the original handwritten data.

This is not a case where defendant has failed to produce documents, nor is it a case where defendants have failed to comply fully with applicable record-keeping requirements. It is simply a case where the information does not support plaintiffs' contentions and does not provide a basis for common proof, precluding a finding of commonality.

3.   <u>Individual Factual Questions Predominate and Preclude Certification.</u>

For the "Late Meal Break Class," Plaintiffs seek relief under Labor Code § 226.7(b) which provides that

> If an employer fails to provide an employee a meal period or rest period in accordance with an applicable order of the Industrial Welfare Commission, the employer shall pay the employee one additional hour of pay <u>at the employee's regular rate of compensation for each work day</u> that the meal or rest period is not provided.

(emphasis added). The one hour payment is tied to the particular work day that the meal or rest period is not provided. Thus, if an employee's regular rate of pay varies from day-to-day, the amount of the one hour payment would be different for each day a meal or rest period is not provided.

The compensation of all the employees in this second purported class consists of two elements: a flat rate and a bonus based upon the number of boxes picked and packed each day. Total compensation is therefore dependent on the variety of grapes being picked, weather, field conditions, and the effort put forth by the employees. Thus, there is no fixed "regular rate of compensation" for any employee in the purported class.

In *Cruz v. Dollar Tree Stores, Inc.*, 2011 U.S. Dist. LEXIS 73938, (N.D. Cal.) the court decertified a class of employees, based upon *Dukes'* rejection of a "trial by formula" to determine damages. Here, since damages are dependent upon an individual's hourly pay for the day he was not authorized or permitted to take a meal break, *Dukes* also would preclude a "trial by formula," leaving no alternative to individualized damage determination.

      4.    <u>A Class Action Would Not be Superior to Other Methods of Adjudication.</u>

Determining the amount of a one hour payment would require identifying for each employee in the payment class, the applicable rate for each day that a meal break was not "authorized and permitted." It would not be enough for plaintiffs to show that on a particular day during the period from 2001-2011, a particular employee did not take a "timely" meal break. An essential part of plaintiff's burden of proof would be to show that the employee was not "authorized or permitted" to take a "timely" meal period.

Thus, each claim involves a highly individualized inquiry as to:

(a) Whether an employee was entitled to a meal break on a particular day (i.e. whether he or she worked five hours);

(b) Whether an employee took a meal break on a particular day;

(c) The starting time and the start of the break;

(d) Whether the employee was "authorized and permitted" to take the break at the required times (Even if a uniform daily rate existed, this prerequisite for liability would still have to be proven for each employee on a daily basis)

-38-

1    (e) The employee's "regular rate of compensation" <u>for that day</u>, which varies for

2         each field worker from day to day.

3    Finally, there is a punitive element to the one hour payment under Labor Code §

4    226.7(b), *Murphy v. Kenneth Cole Productions, Inc.*, 40 Cal. 4th 1094, 1109. Due process

5

6    requires that no plaintiff receive an award based on a defendant's conduct toward another.

7    *Phillip Morris USA v. Wilheims*, 546 U.S. 346, 353 (2007).  Thus, certification of a class of

8    employees claiming they were denied meal breaks is not only improper under *Dukes* if the

9    employee's pay varies daily because they are paid (wholly or in part) on a piece-work basis,

10

11   but a denial of due process.

12   In order to perform the required individualized analysis necessary to determine the

13   applicable rate of pay to comply with the requirements of Rule 23 and due process, it would

14   not be sufficient to examine a sample of payroll records and then extrapolate to generate a

15

16   class-wide pay rate to use in applying Section 226.7(b).  In order to recover under that

17   provision, an employee would first have to identify the specific day in which a meal period

18   was denied (something Plaintiffs' expert says he is unable to do) and then determine his or

19

20   her hourly pay rate <u>for that day</u>.  This kind of individualized inquiry precludes certification

21   of late meal period claims.

22   D.    <u>The "Off-the-Clock" Class is Not Certifiable.</u>

23        Plaintiffs seek certification of a class of "all fieldworkers employed by

24   Giumarra from 11/9/2001 to present."  Plaintiffs claim that fieldworkers have been required

25

26   and/or permitted to work without pay both before the beginning of their shift and after the

27   end of their shift.

28

-39-

1. <u>No Commonality or Typicality</u>

As explained above, no records exist to demonstrate the occurrence or extent of any off-the-clock work.  The sole evidence offered to support this claim is the statements of 77 workers selected by plaintiffs on a non-random basis.  (Plaintiffs' Memorandum, 4: 22-23). Plaintiffs offered no written evidence of off-the-clock work, whether from defendant's records or from putative class members.  None of the plaintiffs' declarants maintained any written record of their claimed off-the-clock work and plaintiffs' expert offered no support for this claim.

Even as to plaintiffs' 77 declarants, fifteen percent said they did not perform off-the-clock work before the start of work.  Plaintiffs' Memorandum, 20-21.  This in itself defeats commonality.  Plaintiffs made no effort to explain why this unrepresentative sampling of workers chosen by Plaintiffs should be extrapolated to the class as a whole.  Moreover, it is clear after *Dukes* that such a sampling would not satisfy Plaintiffs' burden of establishing commonality within the proposed class.  See *Cruz, supra*.

The declarations submitted by defendant, on the other hand, confirm that "I am not allowed to enter the field to work until my foreman says it is time to start.   Never has a foreman or anyone else at Giumarra told or allowed me to come into the field before the start time to gather tools or equipment or to start any other work.  Anyone who says this is wrong." Declarations of Ayala, De La Cruz, Herrera, Miranda, Peralta, Vela, *supra*.  All 237 of Defendant's declarants are in accord, stating that they did not, and were not permitted to work off-the-clock.  (Declaration of Bruce Carroll)

-40-

Similarly, the evidence shows substantial disagreement, even among the named plaintiffs themselves, on the amount of "off-the-clock" time allegedly performed in washing trays. Giumarra's superintendents confirm that such work is performed during the day, and takes only a couple of minutes; that many workers hide their trays in the fields at night; and that those who do take them home mainly do so to prevent theft. (Joe Giumarra decl. ¶4; Stanley decl. ¶8)  On the other hand, some of the named plaintiffs claimed that it can take a substantial amount of time per week to wash trays.

The evidence here plainly demonstrates a complete lack of commonality among putative class members with respect to alleged off-the-clock work.  The declarations of less than one percent of the purported class, which are directly contradicted by the declarations of three times more purported class members, destroys any possibility of commonality.  For example, of plaintiffs' 77 hand-picked Declarants, only 64 (85%), apparently, would say that they performed pre-shift off-the-clock work.  Plaintiffs' Memorandum, pp. 20-21.[15] This circumstance, by itself, shows a lack of commonality, as individualized inquiries would be necessary to determine in each putative class member's case whether the worker did any off-the-clock labor, and if so, when, how much, and why.

Since *Dukes*, courts have repeatedly refused to certify classes based upon off-the-clock claims because they require individualized inquiries:  See e.g., *Morangelli v. Roto Rooter*, 2011 U.S. Dist.  LEXIS 73876 (E.D.N.Y. July 8, 2011) (establishing liability for uncompensated hours for maintenance work would require separate adjustments for each

-41-

plaintiff); *Smith v. Ceva Logistics*, 2011 U.S. Dist. LEXIS 82020 (C.D. Cal. July 25, 2011); *Hadjavi v. CVS Pharmacy*,  2011 U.S. Dist. LEXIS 86341 (C.D. Ca. 2011); *Ugas v. H&R Block*, 2011 U.S. Dist. LEXIS 86769 (C.D. Cal. August 4, 2011) (court refused to certify a California-wide class for an off-the-clock claim).

There are striking differences among plaintiffs' declarants with respect to the amounts of time they allegedly spent performing off-the-clock work.  That is not only because schedules varied from day to day, week to week and season to season.  It is also because declarants recall wildly different amounts of time even on average.  The range, on a daily basis, seems to be from no off-the-clock time[16] to about 20 minutes per day,[17] to an average of approximately 40 minutes,[18] to almost 90 minutes,[19] and even longer.[20]  The amounts of the pre-shift off-the-clock time claimed vary from a few minutes to half an hour.

Another problem with plaintiffs' off-the-clock claims stems from their lack of a clear understanding as to what constitutes off-the-clock "work."  For example,  Rafael Munoz erroneously believes that time spent traveling to and from working constitutes off-the-clock

---

[16] Jose A. Ramos Decl., Exhibit C-4, Document 57, pp. 52-56.

[17] Jesus Carrera Decl. ¶2, *supra*: Miguel Gutierrez Decl.    ¶¶ 2-5, Exhibit C-2,    Document 50, pp.77-78; Carmen Hernandez Decl. ¶¶4-5, *supra.*

[18] Inter alia, Juana Carbajal Decl. ¶¶2, 4, 7, Exhibit C-1, Document 48, pp.76-78;  Petra Gutierrez Decl. ¶¶2-3, Exhibit C-2, Document 50, pp.99-100;  Joaquin Negrete Decl.  ¶¶2, 4-5, Exhibit C-3, Document 53, pp.82-84

[19] (Agustin Lopez Castelan Decl. ¶¶3-4, 7, Exhibit C-1, Document 48, pp.88-90;   Angelica Lopez Decl. ¶¶ 2-6, Exhibit C-3, Document 53, pp. 37-39),

[20] E.g., Dolores Paz Decl ¶7, Exhibit C-3,Document 53, p. 108 (40 minutes, plus,  "it took me a total of approximately 160 minutes to transport the trays from the work site to my home and back to work.").

work.  Deposition of Rafael Munoz 72:23-25, 73:1-3, 82:21-25, 83:1:  Even before *Dukes*, courts consistently refused to certify off-the-clock classes because such claims raise individualized issues and claimant-specific defenses of a legal or factual nature.[21]  *Dukes* confirms the holdings in these pre-*Dukes* cases that no commonality exists in a case like the present one where:

a.  There is no evidence of any Company-wide illegal policies or Labor Code violations;

b.  There are no written records of any off-the-clock work;

c.  The only evidence supporting off-the-clock claims is the undocumented and wildly inconsistent testimony of a small group of putative class members  representing less than one percent of the purported class; and

d.  Their testimony is contradicted by the properly representative testimony of five times as many class members.

_____

[21]  See *Garcia v. Sun Pac. Farming Cooperative*, No. CVF06-0871, 2008 WL 2073979 (E.D. Cal. May 14, 2008) aff'd 359 Fed. App'x 724 (9th Cir. Nov 13, 2009) (denying motion for class certification of state wage and hour claims allegedly resulting from off-the-clock work).  See also *Washington v. Joe's Crab Shack*, 271 F.R.D. 629, 643 (N.D. Cal. 2010) (denying certification where  individualized inquiries were required to determine liability regarding off-the-clock claims); *Reed v. County of Orange*, 266 F.R.D. 446, 452-53 (C.D. Cal. 2010) (holding that the "wide variation" in the plaintiffs' job duties and assignments made the plaintiffs' off-the-clock claims ill-suited for class treatment); *Sheffield v. Orius Corp*., 211 F.R.D. 411, 413 (D. Or. 2002) (court declined to certify off-the-clock class action where affidavits submitted "suggest that each claim would require extensive consideration of individualized issues of liability and damages"); *Koike v. Starbucks Corp*., No. C 06-3215 VRW, 2008 WL 7796650, at *8 (N.D. Cal. June 20, 2008) (denying certification due to the significant individual fact determinations that would be required to establish that the putative plaintiffs had actually worked off-the-clock and finding class treatment was not a superior method for resolution); *Simmons v. T-Mobile USA, Inc.*, No. H-06-1820, 2007 WL 210008, at *6 (S.D. Tex. Jan 24, 2007); *Hinojos v. The Home Depot,  Inc.*, No. 2-06-CV-00108, 2006 WL 3712944, at *2 (D. Nev. Dec. 1, 2006) (denying certification of FLSA class alleging unpaid overtime hours and alteration of time cards because the plaintiffs did "not point to a common policy or practice on nationwide or statewide basis" and individualized determinations were required to resolve the claims of each plaintiff); Lusardi v. Xerox, 118 F.R.D. 351, 359 (D.N.J. 1987).

-43-

The substantial testimony above is sufficient to defeat commonality. As the Court noted in *Dukes*, "We consider dissimilarities not in order to determine (as Rule 23(b)(3) requires) whether common questions *predominate*, but in order to determine as Rule 23(a)(2) requires)whether there is even a single [common] question." *Id*. at*37, *395 (Emphasis added). *See also*: *Garcia v. Sun Pacific Farming Corp.,* US. Dist. LEXIS 111969 (E.D. Cal. 2008), aff'd, 359 Fed.Appx. 724 (9th Cir.2009),: *Smith v. Ceva Logistics*, 2011 U.S. Dist. LEXIS 82020 (C.D. Cal.).  From each Giumarra crew represented by one of plaintiffs' declarants alleging off-the-clock work, defendant has submitted declarations from other members of the same crew who worked during the same time period, stating under penalty of perjury that they did not, and were not permitted to do any work before the start time or after the end time.

This is not a case like *Arrendondo v. Delano Farms*, 2011 U.S. Dist. LEXIS 44134 (E.D. Cal. 2011), where the defendants' declarations did not state dates of employment, and therefore failed to submit any evidence except as to present practices.  Defendant's declarants have clearly stated the dates they worked for Giumarra, and every one of them has stated without hesitation that "The Company has always paid me for every minute that I have worked." *E.g.*, Declaration of Angel Garcia, ¶8.

 In this case, it is plaintiffs' declarations that are vague and misleading with respect to dates and  to time.  Some of plaintiffs' declarations, executed as recently as June 26, 2011, describe their alleged off-the-clock work, misleadingly, in the present tense. *E.g.*, Taurino Dias Valencia Decl. ¶2: Pastor Morales Decl. ¶¶3-4.  Similarly, when the undated past tense is used, the reference could be to something that happened even before the start

of the Class Period (11/10/01).  The Court should treat plaintiffs' putative class declarations as Judge O'Neill did with the defendant's worker declarations in *Arrendondo* case*, supra*.

Plaintiff Ramon Perales, who still works for Giumarra, testified that the alleged off-the-clock work practices ended more than two years ago.  (Markowitz decl. Exhibit D)  A substantial number of plaintiffs' declarants also acknowledge that any off-the-clock work practices at Giumarra have ended.  Unfortunately for the prospect of establishing commonality, they differ among themselves as to when the changes occurred.

Plaintiffs do not attempt to present a representative sample of class workers and then extrapolate from that sample--such an exercise is not sufficiently rigorous under *Dukes*.  As the court stated in *Cruz*, *supra*, "representative testimony from a handful of class members … is now untenable in light on the Ninth Circuit's decision in *Mario II* [and the Supreme Court's Decision in *Dukes*].  *Id*. at p. 12. See also *Garcia v. Sun Pac. Farming Corp.*, supra, (denying motion for class certification of state wage and hour claims allegedly resulting from off-the-clock work), *Washington v. Joe's Crab Shack*, 271 F.R.D. 629, 643 (N.D. Cal. 2010) (denying certification where  individualized inquiries were required to determine liability regarding off-the-clock claims); *Reed v. County of Orange*, 266 F.R.D. 446, 452-53 (C.D. Cal. 2010) (holding that the "wide variation" in the plaintiffs' job duties and assignments made the plaintiffs' off-the-clock claims ill-suited for class treatment); *Sheffield v. Orius Corp.*, 211 F.R.D. 411, 413 (D. Or. 2002) (court declined to certify off-the-clock class action where affidavits submitted "suggest that each claim would require extensive consideration of individualized issues of liability and damages"); *Koike v. Starbucks Corp.,* 2008 WL 7796650, at *8 (N.D. Cal. June 20, 2008) (denying certification

due to the significant individual fact determinations that would be required to establish that the putative plaintiffs had actually worked off-the-clock and finding class treatment was not a superior method for resolution); *Simmons v. T-Mobile USA, Inc.,* 2007 WL 210008, at *6 (S.D. Tex. 2007); *Hinojos v. The Home Depot, Inc.*, 2006 WL 3712944, at *2 (D. Nev. 2006) (denying certification of FLSA class alleging unpaid overtime hours and alteration of time cards because the plaintiffs did "not point to a common policy or practice on nationwide or statewide basis" and individualized determinations were required to resolve the claims of each plaintiff); *Lusardi v. Xerox*, 118 F.R.D. 351, 359 (D.N.J. 1987).

As to the plaintiffs' claim (Plaintiffs' Memorandum, p. 20) that defendant has maintained inadequate records, that contention itself has been found to support the conclusion that individual questions predominate so as to preclude class certification. *Hadjavi v. CVS Pharmacy*, 2011 U.S. Dist. LEXIS 86341 at *12-13. (C.D. Ca. 2011).

Plaintiffs citation of *Hernandez v. Mendoza*, 199 Cal. App. 3d 721 (1988), for the proposition that the burden of proof as to hours worked shifts to defendant is blatantly misleading. Indeed, the Ninth Circuit has rejected *Hernandez* in cases such as this one. The court in *Hernandez* found that the employer's time cards were "clearly made up." Here, plaintiffs are relying of the accuracy of Giumarra's records to prove their case as to meal periods. Plaintiffs can't have it both ways. Moreover, the employer in *Hernandez* admitted that the plaintiff was working "off-the-clock." Giumarra strongly denies that, as supported by the declarations of hundreds of Giumarra's employees. As the Ninth Circuit said in declining to apply *Hernandez* to an off-the-clock claim:

> As Clark and Saiki did not show the actual or approximate hours
> worked in excess of regularly scheduled shifts, the burden never

-46-

shifted to UEAC and *Hernandez v. Mendoza, 199 Cal. App. 3d 721, 727, 245 Cal. Rptr. 36* (1988) is not implicated. [**5]

*Clark v. United Emergency Animal Clinic*, 123 Fed. Appx. 736, 737, (2004).

Further, in denying a class based upon claimed inaccurate wage statements, the court said: "[W]ith respect to Plaintiff's class claims regarding inaccurate wage statements…these claims are wholly derivative of Plaintiff's meal and rest period claims*." Kimoto v. McDonalds' Corp.*, 2008 WL 4690534 (C.D. Cal. 2008). Conflicting anecdotal evidence also precludes a finding of typicality.

2. <u>Plaintiffs Have Failed to Satisfy the Predominance Requirement.</u>

Courts refer to the requirements of Rule 23(b) (3) as the "predominance" and "superiority" requirements. See *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 U.S. 591, 615 (1997). The predominance criterion of Rule 23(b)(3) is "more stringent" and "far more demanding" than the commonality requirement of Rule 23(a). *Amchem*, 521 U.S. at 609- 623-624. To satisfy the Rule 23(b) (3) class certification requirement, a plaintiff must establish not only the existence if common questions, but the predominance of such questions over other issues that are subject only to individualized proof. See *Cordes*, 502 F.3d at 107-108. "The focus [of the predominance criterion] is on the relationship between the common and individual issues." In re *Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 957.

In *Morangelli v. Chemed Corp.*, 2011 U.S. Dist. LEXIS 73807 (E.D.N.Y.), the court decertified a previously certified off-the-clock class based on a lack of predominance under *Dukes*:

-47-

> The prospect of substantial individual testimony tips the scale for the predominance inquiry against class certification…. *Wal-Mart Stores, Inc. v. Dukes*. ***
>
> Establishing liability for uncompensated hours for maintenance work would require separate adjudication of each plaintiff…. *Id*. at *9 -*10.

Certification must be denied if the court determines that "Plaintiffs' claims require fact-intensive, individual analysis" in order to be resolved. *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 938, 947 (9th Cir. 2009).  As already demonstrated, this is clearly the case with plaintiffs' off-the-clock claims.  There was no company-wide program or practice of off-the-clock work and the vast majority of defendants denied that such work occurred. There is no evidence supporting a written policy permitting off-the-clock work. District courts consistently have denied class certification because individual cases predominate in cases in which plaintiff employees have claimed that defendant employers had <u>unwritten</u> practices requiring employees to work during meal and rest breaks.  *Mateo v. V.F. Corp.*, 2009 U.S. Dist. LEXIS 105921 (N.D. Cal.).  *Salazar v. Avis Budget Group, Inc.*, 251 F.R.D. 529, 534 (S.D. Cal. 2008); *Kenny v. Supercuts, Inc.*, 252 F.R.D. 641, 646 (N.D. Cal. 2008); *Brown v. Fed. Express Corp.*, 249 F.R.D. 580, 586-87 (C.D. Cal. 2008); *Blackwell v. SkyWest Airlines, Inc.*, 245 F.R.D. 453, 467 (S.D. Cal. 2007); *Lanzarone v. Guardsmark Holdings, Inc.*, 2006 U.S. Dist. LEXIS 95785, 11-13 (C.D. Cal.); *Wren v. RGIS Inventory Specialists*, 256 F.R.D. 180, 208-209 (N.D. Cal. 2009).

Clearly, individualized inquiries would be required to assess the off-the-clock claim, which defeats predominance.

E.      The "Piece Rate Overtime Class" Is Not Certifiable.

Plaintiffs seek certification of a class of "all fieldworkers employed by Giumarra who were paid a piece-rate from 11/9/2001 to present."  The basis for this proposed class is the  claim that "Workers who earned a piece-rate and worked overtime were not properly compensated for overtime hours worked."   Plaintiffs' Memorandum, 3:15, 16. All of the claimed overtime occurred on supposed off-the-clock work, an allegation that as demonstrated above is not suitable for class treatment.

1.    No Numerosity

None of the named plaintiffs and only five of the of the 77 putative class declarants make any claim for unpaid overtime, and then only in connection with the harvest. [22] Plaintiffs also refer to footnotes, which is simply a list of Declarants who claim to have worked on a piece-rate basis during pruning or tying.  Not one of these workers claim to have worked any overtime during pruning or tying.  These few harvest-season overtime claims depend in turn on dubious claims of compensable but unpaid pre-shift and post-shift "off-the-clock" work.  Without exception, defendant's 237 Declarants deny working any "off-the-clock" time and state that they have been paid for "every minute" that they worked for Giumarra.  Declaration of Bruce Carroll.  The fact that no overtime claims involve pure piece-rate, that only two of Plaintiffs' 13 declarants from Crew 64 (Calvillo, Ramirez), and

---

[22] Mauricia Calvillo Decl. ¶8, Exhibit C-1, Document 48, p. 49; Artemiza Martinez De Marin Decl. ¶6, Exhibit C-2, Document 50, p. 33; Esther Hernandez Decl. ¶5, Exhibit C-3, Document 53, p.5 (ambiguous whether claimed overtime was worked during Class Period); Julio Hernandez Decl. ¶6, Exhibit C-3, Document 53, p. 19; Ermalinda Ramirez Decl. ¶6, Exhibit C-4, Document 57, p. 34. De Marin is not on Plaintiffs' footnote 71 list.  In none of the declaration paragraphs cited by Plaintiffs is there any reference to overtime, but in fact, in the paragraphs cited here, these five-- only five--claim uncompensated overtime work, all during the harvest.

only 5 of 77 overall, make claims for overtime (while differing among themselves as to when and how much) is dispositive of any assertion of the required numerosity of putative class members with piece-rate overtime claims.

As noted above (Section A.1., *supra*), the central question is whether plaintiffs have sufficiently identified and demonstrated the existence of the numbers of persons for whom they speak.  They have not. Plaintiffs have not identified one piece rate worker who worked overtime and was not paid as plaintiffs now claim he or she should have been. Thus, plaintiffs have clearly failed to satisfy the numerosity requirement.

There is no evidence that any fieldworkers working pure piece rate even worked any overtime.  Employees who work on a pure piece rate are not permitted to work overtime. Decl. of Joseph Giumarra, ¶7;  Decl. of Leroy Kuntz, ¶6.  According to Plaintiffs' expert, there are 23,722 checks issued to employees indicating pure piece rate, with no piece rate hours listed on the check.  Thus, it would be impossible for Plaintiffs' expert to know whether an pure piece rate workers worked overtime and, if they did, what they were paid. Woolfson Decl., ¶19.

2.     No Commonality or Typicality

Because of the conflict between the relatively few number of employees who claimed to have worked "off-the-clock" (who comprise all of the "Piece Rate Overtime Class") and all other employees, plaintiffs cannot satisfy the commonality or typicality requirements.

-50-

3.    <u>Individual Factual Questions Predominate.</u>

As described above, individual questions as to whether individual piece-rate employees worked overtime, when and how much, predominate over every other factual issue raised by plaintiffs' purported "piece-rate overtime class" and require that it not be certified.

There is no written record as to whether any individual Giumarra employee worked any unpaid piece-rate overtime and, if so, when or how much.  Accordingly, it is difficult to see how such questions could be answered.  The innumerable individualized inquiries required would completely outweigh the supposedly common issue.

Accordingly, individual questions predominate over common questions.

4.   <u>A Class Action Would Not Be Superior to Any Other Method of Adjudication.</u>

Since there is no record of which piece-rate employees actually worked overtime or when, or how much, there is no way under plaintiffs' theory to determine how much, if anything is owed under plaintiffs' theory to <u>any</u> of the piece-rate employees.  <u>None</u> of the named plaintiffs testified in their depositions that they ever worked overtime while earning on a piece-rate basis.  Only 5 of plaintiffs' declarants specified that they worked overtime while earning box bonuses, that is, working on a modified piece-rate basis. There is no way of determining which or how many of the employees in the proposed class actually worked overtime, when, or how much under plaintiffs' theory.  Accordingly, plaintiffs fail to prove that a class action is a superior method by which to adjudicate any purported piece-rate overtime claims.

F.      The Tool Class Is Not Certifiable.

       1.      No Commonality and Typicality

           Plaintiffs seek certification of a class of "all fieldworkers employed by Giumarra from 11/9/2001 to the present."  The claimed basis for this proposed class is Labor Code § 2802(a).  The sole evidence offered to support this claim are the declarations of 75 workers selected by plaintiffs.  Plaintiffs Memorandum, p. 20-21.  There is no documentary evidence supporting plaintiffs' claims.  No bills, written complaints, etc. were ever received by defendant from plaintiffs relating to the alleged failure to provide tools or reimburse for the expense of tools.  Moreover, plaintiffs admit that, "<u>Giumarra has at times provided limited amounts of some of these tools</u>…."  Plaintiffs Memorandum, p. 12. (Emphasis added).  Thus, by plaintiffs admission, there was no general policy or practice by defendant of not providing required tools and thus the required commonality does not exist. As Jeff Giumarra attests, Giumarra has spent over $300,000 during the class period on tools for employees, thus calling into question the testimony of those workers who claim they were never provided with tools. (Jeff Giumarra decl. par. 15) Further, defendant's declarations uniformly reject the claim that employees were required to purchase clippers or to reimburse the company for broken tools.  Giumarra's superintendents also have somewhat different policies regarding reimbursements for lost or broken tools, as set forth in their declarations. Thus, the required commonality and typicality do not exist.

    2.  Individual Issues Predominate.

       Almost by definition, the question whether an employer was required to reimburse employees for necessary expenses involves an individualized inquiry.

-52-

1
2
3
4
5

> [U]nder California law, questions as to whether Defendants' were required to reimburse employees claimed business expenses involves an individualized factual determination of whether each employee (1) incurred an expense (2) that was necessary (3) and reasonable (4) as a direct consequence of the discharge of his or her duties.  Cal Labor Code § 2802; *Gattusco v. Harta-Hanks Shoppers, Inc.*, 42 Cal. 4th 554 (Cal. 2007).  Those questions alone demonstrate the predomination of individualized issues.

6
7  *Drake v. Morgan Stanley and Company, Inc.*, 2010 U.S. Dist. LEXIS 47 627 *23 (W.D.

8  Cal.).  For other cases denying certification of Labor Code § 2802 claims because of the

9  predominance of individual questions, see *Norris-Wilson v. Delta-T Group, Inc.*, 270

10
11  F.R.D. 596, 610 (S.D. CA. 2010); *Ruiz v. Affinity Logistics Corp.*, 2009 WL 648973 at *7

12  (S.D. Cal. 2009);  *Ramirez v. Labor Ready, Inc.*, 2002 WL 1997037 at *4 (Cal. Sup. Ct.

13  July 22 2002).

14
15          Moreover, "the crux of the inquiry is "the reason for a particular employment

16  decision.' '' *Dukes,* at 2561.  Here, there is no evidence supporting plaintiffs' class but

17  anecdotal evidence from a group of Plaintiffs.-chosen employees representing less than one

18  percent of the class offering differing reasons as to their decisions as to tools.

19
20          The Ninth Circuit has denied certifying claims under Labor Code § 2802 because the

21  difficulty of establishing damages defeats predominance.  In *Harris v. Vector Marketing*

22  *Corporation*, 753 F. Supp. 29996, 1032-1033 (N.D. Cal. 2010), plaintiffs sought to certify a

23  class of over 10,000 employees extending over ten years in forty crews with conflicting

24  practices as to supplying scissors, holsters, etc. The court noted that "the Ninth Circuit has

25  suggested that a relevant fact in the predominance analysis is whether damages calculations

26  would be straightforward.  Determining the necessity of the variety of expenses incurred by

27
28
                                        -53-

Vector Sales Representatives appears to involve <u>qualitative</u> as well as quantitate analysis, not a 'straightforward calculation.'" In *Harris*, the court had "serious concerns about the manageability of the…claim under § 2802" as a result of the need to determine the necessity of the expenses incurred by the employees." *Harris*, 753, F. Supp. 2d at 1022-23. The same individualized inquiry would be required here and makes the claimed tool class unmanageable, as well as defeating commonality.

G.    The "On-Duty Meal Break Class" Is Not Certifiable.

The proposed on-duty meal break class applies only to employees who worked in the cold storage area. This area employs approximately 50 workers during peak season, performing a number of different jobs, including fork lift drivers, banders and pallet taggers.  These employees are responsible for taking fruit off the trucks that arrive from the fields during the day, moving it to the pre-cooling area, then to the cold storage room, and then loading it onto customers' trucks for shipment. (Peoples declaration ¶¶2-3)

1.   No Numerosity or Commonality

As described in more detail in the accompanying declaration of John Peoples, the cold storage employees typically work from 7:00 a.m. to 7:00 p.m. and are paid for all 12 hours including lunch breaks.  Two overlapping shifts of employees work in the loading area, which is managed separately.  All of these employees' schedules permit ample meal and rest breaks. However, due to the flow of work in these areas, these employees have signed waivers agreeing to take one of their meal periods as an on-duty meal period.  Since the employees in these areas perform different duties, and their work ebbs and flows at different times, the court would need to examine each employee's schedule individually to

determine the extent and timing of their meal and rest breaks, and to decide whether or not an on-duty meal period is justifiable in each case. Almost by definition, that task is not well-suited to class-wide resolution.

It would make no sense to certify a class of such a relatively small group of employees who perform a number of different tasks on different schedules so as to resolve an issue that may not even be capable of class-wide resolution.  After such a fact-intensive examination, the court might agree with Giumarra's assessment that there is no practical way of providing these employees with scheduled meal breaks, or it might conclude that a few of these employees could have been given set meal breaks, or that Giumarra should be forced to hire enough additional workers to allow all of these employees to have scheduled meal breaks.  None of these conclusions could be reached, however, without an individualized analysis of the schedule of each category of workers.

But even if plaintiffs could show some justification for doing that—which they cannot—they cannot meet the threshold requirement of standing.   In addition, as with the "unpaid rest break" class, this claim was not asserted in the consolidated class complaint, and plaintiffs should not be permitted to add it now.  *Brown v. American Airlines, Inc.*, *supra*.

2.  No Typicality and No Standing

Not a single one of the named plaintiffs has worked in the cold storage areas. That automatically precludes class certification of an on-duty meal break class. As the Supreme Court held in *Sosna v. Iowa*, 419 U.S. 393 (1975), a court may only certify a class if the suit has been brought by one or more members of the class.  This is not just a question of

-55-

1   interpretation of Rule 23. It is a question of standing.  The Ninth Circuit affirmed this

2   principle this year in *Stearns v. Ticketmaster Corp.*, 2011 U.S. App. LEXIS 17454 (9th Cir.

3   August 22, 2011), holding that at least one of the named plaintiffs must satisfy the actual

4   injury component of standing in order to seek relief on behalf of himself or the class.  See

5

6   also *In re Taco Bell Wage Hour Actions supra* at 12.  In this case, none of the named

7   plaintiffs can satisfy that test. Therefore, the on-duty meal break class cannot be certified.

8   H.      Class Certification Under 23(b)(2) Must be Denied For All Six Classes

9               Irrespective of whether plaintiffs could meet the four prerequisites in Rule 23(a),

10  which they cannot, plaintiffs cannot certify a class under Rule 23(b)(2).

11

12              In *Dukes*, the Supreme Court conclusively rejected this "predominance test" and

13  held that claims that include individualized monetary damages (like plaintiffs) not

14  incidental to the injunctive relief cannot be certified under Rule 23(b)(2).  The *Dukes* Court

15  found that the key to (b)(2) class is "the indivisible nature of the injunctive or declaratory

16  remedy warranted – the notion that the conduct is such that it can be enjoined or declared

17  unlawful only as to all of the class members or as to none of them."  *Id*.  (emphasis added).

18

19  Rule 23(b)(2) does not authorize class certification when each different class member

20  would be entitled to an individualized award of monetary damages against the defendant.

21

22  *Id* at *12-13.

23              Here, injunctive relief would not provide relief to the members of the proposed

24  putative classes who no longer work for Giumarra.  Indeed, former employees cannot

25  properly be a part of an injunctive relief class.  *Id*. at *14 (former employees lack standing

26  to seek injunctive relief against employment practices).  Plaintiffs cannot rectify this

27

28

problem by creating a sub-class of current employees.  As noted in *Dukes*, the trial court would be required to reevaluate the roster of class members continually to remove class members whose employment with Giumarra had ended.

I.      The Six Claims Should Not Be Certified Under 23(b)(3).

        Even if plaintiffs could satisfy the Rule 23(a) requirements, which they cannot, plaintiffs' claims should not be certified under Rule 23(b)(3).  "[T]o meet the predominance requirement of Rule 23(b)(3), a plaintiff must establish that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole… predominate over those issues that are subject only to individualized proof."   *In re Visa Check/Master Money Antitrust Litig.*, 280 F. 3d 124, 136 (2d Cir. 2001).  As the Ninth Circuit recently explained, "the predominance inquiry focuses of 'the relationship between the common and individual issues' and 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"  *Vinole v. Countrywide Home Loans, Inc.*, 571 F. 3d 935, 944 (9th Cir. 2009); *In re Wells Fargo Home Mortgage Overtime Pay Litigation*, 571 F. 3d 953, 957 (9th Cir. 2009).  Here, individual issues predominate.

///

**IV.**

**CONCLUSION**

Plaintiffs' lawsuit is an anachronism with no evidentiary support.  It ignores *Dukes* and the flood of post-*Dukes* cases denying class certification for even stronger claims.  The sole evidence offered to support the six proposed classes is the "opinion" of an expert who testified that he has no opinion on the issues of the case, and anecdotal evidence that the Court in *Dukes* declared cannot be relied upon.  Just a fraction of the members of the purported classes give evidence to support plaintiffs' contentions, and they are directly contradicted by many more class members and management.  For these reasons, defendant respectfully requests that that plaintiffs' Motion for Class Certification be denied in its entirety.

Dated: September 30, 2011           LAW OFFICES OF JOSEPH E. HERMAN


                                    By:  */s/ Joseph E. Herman*
                                         Joseph E. Herman


Dated: September 30, 2011           LAW OFFICES OF JOSEPH C. MARKOWITZ


                                    By:  */s/  Joseph C. Markowitz*
                                         Joseph C. Markowitz

                                         Attorneys for Defendant,
                                         Giumarra Vineyards Corporation